**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

IN RE SECONDARY TICKET MARKET )
REFUND LITIGATION )
)

**MDL Docket No. 2951**

**RESPONSE OF VIVID SEATS LLC
IN OPPOSITION TO MOTION FOR TRANSFER OF ACTIONS TO
THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 U.S.C. § 1407**

Date:  June 22, 2020

Mark S. Mester
    mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Counsel for Vivid Seats LLC

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ..................................................................................................1

II.    FACTUAL BACKGROUND ...............................................................................3

  A.    Only One Action Has Been Filed Against Vivid Seats, And It Does Not
        Involve SeatGeek Or StubHub In Any Way, Shape Or Form ................................3

    1.    The Vivid Seats Action Turns On Alleged Promises,
          Representations, Marketing And Actions Unique To Vivid Seats
          And Its Customers.........................................................................................3

    2.    The Vivid Seats Plaintiffs Bought Tickets To Events Not At Issue
          In Any Of The Other Cases ..........................................................................4

    3.    The Vivid Seats Plaintiffs Seek To Represent A Class Of Vivid
          Seats Customers Not Implicated By The Other Actions ...............................5

    4.    Vivid Seats Has Unique Defenses To The Vivid Seats Action ..................5

  B.    Only One Action Has Been Filed Against SeatGeek, And It Does Not
        Involve Vivid Seats Or StubHub In Any Way.........................................................6

    1.    The SeatGeek Action Turns On Alleged Promises,
          Representations, Marketing And Actions Unique To SeatGeek And
          Its Customers ................................................................................................6

    2.    The SeatGeek Plaintiffs Bought Tickets To Unique Events, Only
          Seek To Represent SeatGeek Customers, Bring Only State Law
          Claims, Agreed Their Terms Of Use Are Governed By New York
          Law And Are Subject To Unique Defenses...................................................7

  C.    The StubHub Actions Were Filed Against StubHub And Do Not Involve
        Vivid Seats Or SeatGeek In Any Way.....................................................................8

    1.    The StubHub Actions Turn On Alleged Promises, Representations,
          Marketing And Actions Unique To StubHub And Its Customers ..............8

    2.    The StubHub Plaintiffs Bought Tickets To Unique Events, Only
          Seek To Represent StubHub Customers, Bring State Law Claims,
          Agreed Their Terms Of Use Are Governed By California Law And
          Are Subject To Unique Defenses..................................................................9

**Page**

III.   ARGUMENT ..............................................................................................................10

     A.     Common Questions Of Fact Do Not Predominate For Purposes Of Transfer ........................................................................................................11

           1.     The Vivid Seats Action And The Other Actions Involve <u>Entirely</u> Different Parties And Proposed Classes ....................................................11

           2.     The Vivid Seats Action And The Other Actions Involve Entirely <u>Different</u> Alleged Guarantees, Refund Policies And Representations ..........................................................................................12

           3.     The Vivid Seats Action And The Other Actions Raise Action-Specific Questions Regarding Knowledge And Intent .............................14

           4.     Movants' Assertion Of A Common Business Model Is Insufficient To Justify Transfer .....................................................................................15

     B.     Centralization Would Not Serve The Convenience Of The Parties Or The Witnesses ......................................................................................................16

     C.     Centralization Would Not Promote The Just And Efficient Conduct Of The Litigation..........................................................................................................18

     D.     Alternatives To A Multidistrict Litigation ............................................................19

IV.   CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

In re Air Fare,
    322 F.Supp. 1013 (J.P.M.L. 1971) ............................................................. 16

In re Am. Bd. of Med.,
    382 F.Supp.3d 1353 (J.P.M.L. 2019) ................................... 15, 16, 18, 19

In re Ambulatory Pain,
    709 F.Supp.2d 1375 (J.P.M.L. 2010) ......................................................... 18

In re AriZona,
    609 F.Supp.2d 1369 (J.P.M.L. 2009) ......................................................... 18

In re AT&T,
    710 F.Supp.2d 1378 (J.P.M.L. 2010) ......................................................... 20

In re Best Buy,
    804 F.Supp.2d 1376 (J.P.M.L. 2011) ................................................. 19, 20

In re Checking Account,
    626 F.Supp.2d 1333 (J.P.M.L. 2009) ......................................................... 16

In re CleanNet,
    38 F.Supp.3d 1382 (J.P.M.L. 2014) ..................................................... 11, 15

In re Comp.,
    206 F.Supp.2d 1374 (J.P.M.L. 2002) ......................................................... 11

In re Cordarone,
    190 F.Supp.3d 1346 (J.P.M.L. 2016) ......................................................... 11

In re CP4 Fuel Pump,
    412 F.Supp.3d 1365 (J.P.M.L. 2019) ............................ 13, 15, 17, 19

In re Credit Card Payment,
    753 F.Supp.2d 1375 (J.P.M.L. 2010) ................................... 11, 14, 16

In re Credit Union,
    158 F.Supp.3d 1363 (J.P.M.L. 2016) ................................... 11, 12, 19

In re E.I. du Pont,
    939 F.Supp.2d 1374 (J.P.M.L. 2013) ......................................................... 15

In re Enhanced Recovery,
    363 F.Supp.3d 1375 (J.P.M.L. 2019) ......................................................... 10

**Page(s)**

In re Facebook,
  816 F.Supp.2d 1380 (J.P.M.L. 2011) ........................................................ 13

In re Fla., P.R. & V.I.,
  325 F.Supp.3d 1367 (J.P.M.L. 2018) .................................................... 15, 17

In re Goodman,
  987 F.Supp.2d 1380 (J.P.M.L. 2013) ........................................................ 19

In re Hercules,
  816 F.Supp.2d 1377 (J.P.M.L. 2011) ........................................................ 10

In re Hotel Indus.,
  2020 WL 581882 (J.P.M.L. 2020) ............................................................ 17

In re Humana,
  2000 WL 1925080 (J.P.M.L. 2000) .......................................................... 16

In re Katz,
  481 F.Supp.2d 1353 (J.P.M.L. 2007) ........................................................ 15

In re Louisiana Coastal Zone,
  317 F.Supp.3d 1346 (J.P.M.L. 2018) ........................................................ 15

In re Mortg. Lender,
  895 F.Supp.2d 1352 (J.P.M.L. 2012) .................................................... 15, 16

In re Narconon,
  84 F.Supp.3d 1367 (J.P.M.L. 2015) .......................................................... 19

In re Nat'l Credit Union,
  996 F.Supp.2d 1374 (J.P.M.L. 2014) ........................................................ 13

In re Nat'l Prescription,
  290 F.Supp.3d 1375 (J.P.M.L. 2017) ........................................................ 16

In re NebuAd,
  716 F.Supp.2d 1370 (J.P.M.L. 2010) ........................................................ 11

In re Ocala Funding,
  867 F.Supp.2d 1332 (J.P.M.L. 2012) .................................................... 12, 13

In re Pharmacy,
  206 F.Supp.2d 1362 (J.P.M.L. 2002) ........................................................ 12

In re Propulsid,
  2000 U.S. Dist. LEXIS 11651 (J.P.M.L. 2000) ............................................ 11

**Page(s)**

In re Proton-Pump II,
   261 F.Supp.3d 1351 (J.P.M.L. 2017) ........................................................... 12

In re Proton-Pump,
   273 F.Supp.3d 1360 (J.P.M.L. 2017) ........................................................... 12

In re Provident,
   715 F.Supp.2d 1356 (J.P.M.L. 2010) ...................................................... 16, 17

In re Pub. Air Travel,
   360 F.Supp. 1397 (J.P.M.L. 1973) ............................................................... 16

In re Reglan,
   622 F.Supp.2d 1380 (J.P.M.L. 2009) ........................................................... 19

In re Rely Tampon,
   533 F.Supp. 1346 (J.P.M.L. 1982) ............................................................... 11

In re Samsung,
   322 F.Supp.3d 1380 (J.P.M.L. 2018) ........................................................... 11

In re Satyam,
   712 F.Supp.2d 1381 (J.P.M.L. 2010) ........................................................... 15

In re Skinnygirl,
   829 F.Supp.2d 1380 (J.P.M.L. 2011) ...................................................... 14, 18

In re Trilegiant,
   828 F.Supp.2d 1362 (J.P.M.L. 2011) ........................................................... 19

In re Tropicana,
   867 F.Supp.2d 1341 (J.P.M.L. 2012) ........................................................... 20

In re Uber,
   158 F.Supp.3d 1372 (J.P.M.L. 2016) ...................................................... 18, 19

In re Watson,
   883 F.Supp.2d 1350 (J.P.M.L. 2012) ........................................................... 17

In re Wells Fargo,
   2020 WL 1503252 (J.P.M.L. 2020) ............................................................. 19

In re Xarelto,
   65 F.Supp.3d 1402 (J.P.M.L. 2014) ............................................................. 15

In re Yellow Brass,
   844 F.Supp.2d 1377 (J.P.M.L. 2012) ........................................................... 17

**Page(s)**

In re Yosemite,
   24 F.Supp.3d 1370 (J.P.M.L. 2014) ...................................................................... 18

In re Zimmer,
   802 F.Supp.2d 1374 (J.P.M.L. 2011) ..................................................................... 15

Thompson v. Am. Airlines,
   128 F.Supp.3d 1047 (N.D. Ill. 2015) ..................................................................... 14

## STATUTES

28 U.S.C. § 1407 ............................................................................................................. 11

## OTHER AUTHORITIES

Multidistrict Litig. Manual § 5:11 .................................................................................. 11

Vivid Seats LLC ("Vivid Seats") submits the following response in opposition to the motion filed by the plaintiffs in <u>Nellis v. Vivid Seats</u>, No. 1:20-cv-02486 (N.D. Ill.) ("Vivid Seats Action"),[1] <u>Trader v. SeatGeek</u>, No. 1:20-cv-03248 (S.D.N.Y.) ("SeatGeek Action"), and <u>McMillan v. StubHub</u>, No. 3:20-cv-00319 (W.D. Wis.) (together, the "Movants") to transfer six class action lawsuits brought by various individuals ("Plaintiffs") against <u>either</u> Vivid Seats, SeatGeek, Inc. ("SeatGeek") or StubHub, Inc. and/or its affiliate Last Minute Transactions, Inc.[2] ("StubHub") (each, a "Defendant") for coordinated or consolidated pretrial proceedings:

## I.    INTRODUCTION

Movants seek to use the COVID-19 pandemic -- which has impacted every person and business in the country -- to create common issues of fact where none otherwise exists.  They identify six class action lawsuits that each allege that <u>one</u> particular online ticket marketplace -- <u>either</u> Vivid Seats, SeatGeek <u>or</u> StubHub -- purportedly breached its respective guarantee to refund the price of tickets to attend third-party events after those events were canceled due to the pandemic.  Movants, in turn, claim the "factual and legal issues in the cases are as similar as they could possibly be."  Mem. (Dkt. 3-1) at 8.

But Movants' request for transfer and consolidation rests largely on empty rhetoric.  The six actions are brought by <u>different</u> Plaintiffs who purchased tickets to <u>different</u> events, and the Defendants are <u>different</u> too.  Only one case was filed against Vivid Seats.  Only one case was filed against SeatGeek.  And the other four actions were filed only against StubHub (the "StubHub

---

[1] The Vivid Seats Action was also filed against "Vivid Seats LTD.," which was consolidated into Vivid Seats LLC in 2016 and no longer exists.  <u>See</u> <u>Nellis</u> Compl. (Dkt. 1-7) ¶ 14.

[2] Last Minute Transactions is a corporate affiliate of StubHub and a Defendant in <u>Reynolds</u> and <u>McMillan</u>, because it "is a party to StubHub's contractual agreement with its users."  <u>Reynolds</u> Compl. (Dkt. 1-9) ¶ 14; <u>McMillan</u> Compl. (Dkt. 1-4) ¶ 14.  It is, however, not alleged to run a ticket marketplace separate from StubHub.  <u>See</u> <u>Reynolds</u> Compl.; <u>McMillan</u> Compl.

Actions").[3]   The Vivid Seats Action and the other actions involve <u>different</u> proposed classes, <u>different</u> online marketplaces and terms of use, <u>different</u> marketing materials, <u>different</u> refund policies, <u>different</u> dispute resolution procedures and <u>different</u> state law claims under the laws of <u>different</u> states.  Plaintiffs in the separate actions variously allege that each Defendant knowingly and intentionally made false promises and failed to honor its refund policy to its customers.  But the alleged marketing and advertising are entirely unique to each Defendant, as are each Defendant's knowledge and intent.

As a result, transfer and consolidation will neither serve the convenience of the parties and witnesses nor promote judicial efficiency.  Indeed, none of the discovery will be the same.  Vivid Seats, SeatGeek and StubHub are <u>competitors</u> with separate employees, websites and customers. Each separately developed its own refund policy, prepared its own marketing materials and decided how to respond to each event cancellation.  Discovery of what each Defendant did, knew or possesses will thus involve documents and witnesses <u>unique</u> to <u>each</u> Defendant.  Moreover, Plaintiffs bought tickets to different events, and thus, discovery into why each Plaintiff purchased a ticket and whether he or she received a satisfactory refund will be unique to each case and each event.

Similarly, no risk of inconsistent rulings exists, much less one that would justify transfer. The terms of use governing ticket purchases from each Defendant's website are governed by the laws of <u>different</u> states (<u>either</u> Illinois, New York <u>or</u> California).  The courts will, therefore, need to separately assess whether each Defendant can enforce any available arbitration procedures, whether each Defendant made false representations or breached a contract and whether each Plaintiff or class member received a refund or agreed to some other relief.  Thus, any rulings on

---

[3] The four StubHub Actions are as follows:  (1) <u>Alcaraz v. StubHub</u>, No. 3:20-cv-02595 (N.D. Cal.); (2) <u>Kopfmann v. StubHub</u>, No. 4:20-cv-03025 (N.D. Cal.); (3) <u>McMillan v. StubHub</u>; and (4) <u>Reynolds v. StubHub</u>, No. 1:20-cv-03508 (S.D.N.Y.).

the merits as to one Defendant cannot serve as a ruling as to another Defendant. Moreover, the proposed classes do not overlap at all, such that there is no risk of inconsistent rulings on class certification. And given the unique factual and legal issues, the Panel should deny the motion.

## II.    FACTUAL BACKGROUND

### A.   Only One Action Has Been Filed Against Vivid Seats, And It Does Not Involve SeatGeek Or StubHub In Any Way, Shape Or Form

On April 23, 2020, Plaintiffs Timothy Nellis, Janel Dranes and Lucy Sousa (the "Vivid Seats Plaintiffs") filed the Vivid Seats Action in the United States District Court for the Northern District of Illinois. See Nellis Compl. Neither SeatGeek nor StubHub is a party to the Vivid Seats Action, and the Vivid Seats Plaintiffs are not parties to the actions against SeatGeek and StubHub. See id.; Alcaraz Compl. (Dkt. 1-5); Kopfmann Compl. (Dkt. 1-6); McMillan Compl.; Reynolds Compl.; Trader Am. Compl. (Dkt. 1-8).

### 1.   The Vivid Seats Action Turns On Alleged Promises, Representations, Marketing And Actions Unique To Vivid Seats And Its Customers

The Vivid Seats Plaintiffs allege that Vivid Seats runs a secondary online ticket marketplace (www.vividseats.com) through which Vivid Seats sells tickets to events put on by third parties. See Nellis Compl. ¶¶ 3, 4, 19. They claim Vivid Seats breached its 100% Buyer Guarantee, under which Vivid Seats allegedly promised its customers it would refund the price of tickets to canceled events. See id. ¶¶ 36-68. They further allege that Vivid Seats' customers "relied upon that promise when making ticket purchases." Id. ¶ 41.

The Vivid Seats Plaintiffs rest their claims on Vivid Seats' alleged marketing of the 100% Buyer Guarantee. See, e.g., Nellis Compl. ¶¶ 42, 43 ("Vivid Seats ran television commercials featuring superstar athletes."). They include pictures allegedly from advertisements for Vivid Seats' marketplace as well as representations allegedly made on Vivid Seats' website. See id. ¶¶ 45-48. And they base their claims on what Vivid Seats "intends," "intended," "knows," "knew"

or "should have known" (id. ¶¶ 49, 97(d), 110, 119, 128, 164, 186, 195, 207, 241, 247, 249, 258) and on why "Vivid Seats users are willing to pay" Vivid Seats for tickets.  Id. ¶ 50.

Finally, the claims in the Vivid Seats Action arise out of Vivid Seats' particular response to the COVID-19 pandemic and particular approach to honoring the 100% Buyer Guarantee.  See Nellis Compl. ¶¶ 52-68.  The Vivid Seats Plaintiffs point to alleged assurances that Vivid Seats made on March 13, 2020 to invite "consumers to put full faith and trust" in the Company and allege that Vivid Seats allowed its customers to "choose a 120% credit in lieu of a full cash refund." Id. ¶¶ 53-56.  They then allege that Vivid Seats "changed its website's advertisement," "refused to honor its widely advertised 100% Buyer Guarantee" and "reduced the amount" of the offered credit.  Id. ¶¶ 58-60.  They nevertheless acknowledge, however, that Vivid Seats is providing full refunds to customers who request them.  See id. ¶ 62; see also Information Regarding the Coronavirus   Impact,   https://support.vividseats.com/support/solutions/articles/11000083676-information-regarding-the-coronavirus-impact.

### 2.  The Vivid Seats Plaintiffs Bought Tickets To Events Not At Issue In Any Of The Other Cases

Plaintiff Timothy Nellis alleges that he used Vivid Seats' website to purchase a ticket to a New York Yankees–Minnesota Twins baseball game.  See Nellis Compl. ¶ 69.  Plaintiff Janel Dranes alleges that she purchased two tickets to the Big Ten Men's Basketball Tournament.  See id. ¶ 75.  And Plaintiff Lucy Sousa alleges that she purchased tickets to three different events: World Wrestling Enterprises' ("WWE's") WrestleMania, WWE's Monday Night Raw and an October 6, 2020 concert in Boston featuring Ricky Martin and Enrique Iglesias.[4]  See id. ¶¶ 83-86.  None of the Plaintiffs in the StubHub Actions or the SeatGeek Action, however, bought tickets to the foregoing events, much less through Vivid Seats.  See Alcaraz Compl. ¶ 14; Kopfmann Compl. ¶ 33; McMillan Compl. ¶ 51; Reynolds Compl. ¶ 50; Trader Am. Compl. ¶¶ 56, 58.

---

[4] Plaintiff Sousa acknowledges the Martin–Iglesias concert has not been canceled.  See Nellis Comp. ¶ 88.

### 3.   The Vivid Seats Plaintiffs Seek To Represent A Class Of Vivid Seats Customers Not Implicated By The Other Actions

The Vivid Seats Plaintiffs seek to represent a class of persons "who used Vivid Seats to purchase tickets."[5] <u>Nellis</u> Compl. ¶ 94.  The Vivid Seats Plaintiffs do <u>not</u> seek to bring claims on behalf of customers of StubHub or SeatGeek, and the Plaintiffs in the SeatGeek Action and the other actions do not seek to represent Vivid Seats customers.  <u>See</u> <u>Alcaraz</u> Compl. ¶ 19; <u>Kopfmann</u> Compl. ¶ 38; <u>McMillan</u> Compl. ¶ 56; <u>Reynolds</u> Compl. ¶ 57; <u>Trader</u> Am. Compl. ¶ 62.

### 4.   Vivid Seats Has Unique Defenses To The Vivid Seats Action

The Vivid Seats Plaintiffs assert only state law claims (<u>Nellis</u> Compl. ¶¶ 103-284), and they agreed that the terms of use for their ticket purchases would be governed by Illinois law.  <u>See</u> Vivid Seats Terms of Use, Ex. A hereto, at 11.  None of these claims, however, implicates any federal law or national policy, nor are they based on allegations that Vivid Seats acted in concert with SeatGeek or StubHub.  <u>See</u> <u>Nellis</u> Compl. ¶¶ 103-284.

Moreover, Vivid Seats has unique defenses to the claims against it.  For example, some (if not all) of the Vivid Seats Plaintiffs already received a full refund of their ticket purchases.  <u>See</u> Nellis Order Notes, Ex. B hereto, at 3 (offer of credit "converted to 100% refund" and "refund issued"); Dranes Order Notes, Ex. C hereto, at 2 (same).  Many other customers either received full refunds or knowingly agreed to accept a credit in fulfillment of the 100% Buyer Guarantee.  And Plaintiff Sousa admits that one of her events has not yet even been canceled.  <u>See</u> <u>Nellis</u> Compl. ¶ 88.

All of the Vivid Seats Plaintiffs also acknowledged and agreed to Vivid Seats' Terms of Use when they purchased their tickets.  <u>See</u> Vivid Seats Terms of Use, Ex. A.  The Vivid Seats Terms of Use require the Vivid Seats Plaintiffs to submit their claims to "final and binding arbitration" on a non-class basis according to the specific procedures set forth therein.  <u>See</u> <u>id.</u> at 9-

---

[5] They also seek to represent similar subclasses of Vivid Seats customers in Illinois, Florida and New Hampshire.  <u>See</u> <u>Nellis</u> Compl. ¶ 94.

10.  The Terms of Use also contain a disclaimer of warranties, limitations of liability and a force majeure clause applicable to any "epidemic."  See id. at 7-9, 10-11.  These provisions raise defenses that are unique to the Vivid Seats Action, however, and they further show that there is no factual or legal overlap between the Vivid Seats Action or the SeatGeek Action and StubHub Actions.  See disc. supra at 3-5; disc. infra 6-10.

### B.   Only One Action Has Been Filed Against SeatGeek, And It Does Not Involve Vivid Seats Or StubHub In Any Way

On May 18, 2020, Plaintiffs Dustin Snyder and Lindsey Anderson (the "SeatGeek Plaintiffs") filed an Amended Complaint in the SeatGeek Action against SeatGeek in the United States District Court for the Southern District of New York.  See Trader Am. Compl.  Neither Vivid Seats nor StubHub is a party to the SeatGeek Action (id. ¶¶ 10-12), and the SeatGeek Plaintiffs are not parties to the actions against Vivid Seats and StubHub.  See id.; Alcaraz Compl.; Kopfmann Compl.; McMillan Compl.; Nellis Compl.; Reynolds Compl.

### 1.   The SeatGeek Action Turns On Alleged Promises, Representations, Marketing And Actions Unique To SeatGeek And Its Customers

SeatGeek is a competitor of both Vivid Seats and StubHub and runs its own secondary ticket marketplace (www.seatgeek.com).  See Trader Am. Compl. ¶ 3.  The SeatGeek Action relates only to the "SeatGeek Buyer Guarantee," which allegedly offers customers refunds according to its terms if events to which they purchased tickets through SeatGeek are canceled. See, e.g., id. ¶ 37.  The SeatGeek Plaintiffs allege that the SeatGeek Buyer Guarantee "was incorporated into various communications to consumers and heavily marketed to prospective customers."  Id. ¶ 13.

The claims in the SeatGeek Action relate to misrepresentations that only SeatGeek allegedly made in its advertising campaign.  See Trader Am. Compl. ¶ 39 ("The SeatGeek Buyer Guarantee was heavily advertised, and features prominently on the Website."); id. ("[T]he SeatGeek Buyer Guarantee remains fixed and visible during the entirety of the SeatGeek shopping

6

and purchasing process.").  Indeed, the Complaint in the SeatGeek Action includes screenshots from the SeatGeek website.  See id.  And the claims against SeatGeek turn on what SeatGeek "intends," "intended," "knows," "knew" or "should have known" (id. ¶¶ 38, 40, 47, 65(d), 93, 103, 111) as well as on why "SeatGeek users are willing to pay" SeatGeek for tickets.  Id. ¶ 41.

The SeatGeek Action relates only to SeatGeek's particular response to the COVID-19 pandemic and its particular approach to cancellations of events to which it sold tickets.  See Trader Am. Compl. ¶¶ 43-55.  The SeatGeek Plaintiffs allege that SeatGeek updated its website on March 12, 2020, issued Twitter communications to customers and created a "designated Covid-10 [sic] Update page."  Id. ¶¶ 44-46.  They further allege that SeatGeek ultimately changed the SeatGeek Buyer Guarantee so that a customer would receive either a refund or a credit "in SeatGeek's sole discretion."  Id. ¶ 50 (citations and quotations omitted).

## 2. The SeatGeek Plaintiffs Bought Tickets To Unique Events, Only Seek To Represent SeatGeek Customers, Bring Only State Law Claims, Agreed Their Terms Of Use Are Governed By New York Law And Are Subject To Unique Defenses

Plaintiff Dustin Snyder in the SeatGeek Action allegedly purchased a ticket to a San Francisco Giants–Atlanta Braves baseball game, and Plaintiff Lindsey Anderson allegedly purchased tickets to a Supercross event.  See Trader Am. Compl. ¶¶ 56, 58.  None of the Plaintiffs in the Vivid Seats Action or the StubHub Actions, however, bought tickets to the foregoing events.  See Alcaraz Compl. ¶ 14; Kopfmann Compl. ¶ 33; McMillan Compl. ¶ 51; Nellis Compl. ¶¶ 69, 75, 83-86; Reynolds Compl. ¶ 50.

The SeatGeek Plaintiffs seek to represent a class of persons "who used SeatGeek to purchase tickets."  Trader Am. Compl. ¶ 62.  They do not seek to bring claims on behalf of customers of Vivid Seats or StubHub.  See id.  The SeatGeek Plaintiffs assert only state law claims (id. ¶¶ 71-138), and the SeatGeek Plaintiffs agreed that the terms of use of their ticket purchases are governed by New York law, not Illinois law.  See SeatGeek User Agt., https://seatgeek.com/ terms, § 15.7.  None of the claims against SeatGeek implicates any federal law or national policy

7

nor do the Plaintiffs in the SeatGeek Action allege that SeatGeek acted in concert with StubHub or Vivid Seats.  See Trader Am. Compl. ¶¶ 71-138.

While Vivid Seats is a competitor of SeatGeek and does not know all the defenses SeatGeek may assert, the Agreement Between User And SeatGeek at minimum creates defenses under New York law related to disclaimers of warranties and conditions, non-liability for conduct of third parties, limitations of liability, a cap on liability, alternative dispute resolution, waiver of jury trial, waiver of representative actions and a force majeure clause that covers "acts of God." See SeatGeek User Agt., https://seatgeek.com/terms, §§ 9.1, 9.2, 9.3, 10.2, 14.1-14.4, 15.4.

### C.   The StubHub Actions Were Filed Against StubHub And Do Not Involve Vivid Seats Or SeatGeek In Any Way

Plaintiffs in the StubHub Actions filed their complaints in courts in California, New York and Wisconsin.  See Alcaraz Compl.; Kopfmann; Compl.; McMillan Compl.; Reynolds Compl. Neither Vivid Seats nor SeatGeek is a party to any of the StubHub Actions, and the StubHub Plaintiffs are not parties to the actions against Vivid Seats and SeatGeek.  See id.; Nellis Compl.; Trader Am. Compl.

### 1.   The StubHub Actions Turn On Alleged Promises, Representations, Marketing And Actions Unique To StubHub And Its Customers

StubHub is a competitor of Vivid Seats and SeatGeek, and StubHub runs its own secondary marketplace (www.stubhub.com).  See, e.g., Kopfmann Compl. ¶ 13.  The StubHub Actions relate only to StubHub's "FanProtect Guarantee," which allegedly meant that "every order is 100% guaranteed" and ensured refunds if events were canceled.  Id. ¶¶ 21-24.  The StubHub Actions center around allegations that StubHub made false representations in its trademark application, commercials and marketing materials.  See, e.g., id. ¶ 24 (referencing "trademark application"); id. ¶ 25 (alleging "commercials still available on YouTube"); id. ¶ 26 (substantially same); id. ¶ 27 (referencing statements on "Major League Baseball's website"); id. ¶ 28 (referencing language "on StubHub's website"); Alcaraz Compl. ¶¶ 6-12 (citing screenshots of StubHub website).  The

claims against StubHub turn on what StubHub "advertised," "promoted," "misrepresented," "marketed," "intends," "intended," "knows," "knew" or "should have known" (see Alcaraz Compl. ¶¶ 27, 33, 54, 57, 67, 70, 76; Kopfmann Compl. ¶¶ 71, 73, 88; McMillan Compl. ¶¶ 59(e), 84, 93(b), 94, 113; Reynolds Compl. ¶¶ 60(e), 85, 94(b), 95, 114) and on why "StubHub users have been willing to pay . . . substantial fees directly to StubHub." McMillan Compl. ¶ 18.

The StubHub Actions relate only to StubHub's particular response to the COVID-19 pandemic and its particular approach to cancellations of events to which it sold tickets. See Alcaraz Compl. ¶¶ 4-12; Kopfmann Compl. ¶¶ 29-31; McMillan Compl. ¶¶ 20-29; Reynolds Compl. ¶¶ 20-29. The StubHub Plaintiffs allege that StubHub emailed customers on or around March 7, 2020, offering them a full refund for tickets to canceled events or a coupon equal to 120% of the purchase price. See Alcaraz Compl. ¶ 4; Kopfmann Compl. ¶ 29; McMillan Compl. ¶ 21; Reynolds Compl. ¶ 21. They further allege that StubHub ultimately changed the terms of the FanProtect Guarantee so that a customer would "get a refund or credit for use on a future purchase, as determined in StubHub's sole discretion (unless a refund is required by law)." McMillan Compl. ¶ 23; see also Alcaraz Compl. ¶ 5; Kopfmann Compl. ¶ 30; Reynolds Compl. ¶ 23.

## 2. The StubHub Plaintiffs Bought Tickets To Unique Events, Only Seek To Represent StubHub Customers, Bring State Law Claims, Agreed Their Terms Of Use Are Governed By California Law And Are Subject To Unique Defenses

The StubHub Plaintiffs collectively claim to have purchased tickets to a Flogging Molly concert, a Cincinnati Reds–Chicago Cubs baseball game, a Winnipeg Jets–Minnesota Wild hockey game and a Riverdance performance. See Alcaraz Compl. ¶ 14; Kopfmann Compl. ¶ 33; McMillan Compl. ¶ 51; Reynolds Compl. ¶ 50. None of the Plaintiffs in the Vivid Seats Action or the SeatGeek Action, however, bought tickets to the foregoing events. See disc. supra at 4, 7.

The StubHub Plaintiffs only seek to represent a class of persons who purchased tickets through StubHub.[6] See Alcaraz Compl. ¶ 19; Kopfmann Compl. ¶ 38; McMillan Compl. ¶ 56;

---

[6] Plaintiff Alcaraz also seeks to represent a similar California subclass. See Alcaraz Compl. ¶ 20.

Reynolds Compl. ¶ 57.  They do not seek to bring claims on behalf of customers of Vivid Seats or SeatGeek.  See id.  They assert only state law claims.  See Alcaraz Compl. ¶¶ 29-90; Kopfmann Compl. ¶¶ 52-89; McMillan Compl. ¶¶ 65-113; Reynolds Compl. ¶¶ 66-114.  And they agreed that the terms of use of their ticket purchases would be governed by California law, not Illinois or New York law.  See StubHub User Agt., https://stubhub.com/legal/?section=fp, § 21.  None of the claims against StubHub, however, implicates any federal law or national policy, nor do they include allegations that StubHub acted in concert with SeatGeek or Vivid Seats.  See Alcaraz Compl. ¶¶ 29-90; Kopfmann Compl. ¶¶ 52-89; McMillan Compl. ¶¶ 65-113; Reynolds Compl. ¶¶ 66-114.

While Vivid Seats does not know all of the defenses StubHub may assert, the agreement between StubHub and its customers at minimum creates defenses under California law related to disclaimers of warranties, non-liability for conduct of third parties, limitations of liability, alternative dispute resolution, waiver of class actions and a force majeure clause that covers any "epidemic" or "executive, administrative or judicial order."  See StubHub User Agt., https://stubhub.com/legal/?section=fp, §§ 1, 13.1, 20.1, 20.2, 22, 26.

## III.   ARGUMENT

Transfer and consolidation are only appropriate when (1) the actions involve "common questions of fact," (2) transfer would be "for the convenience of parties and witnesses" and (3) transfer would "promote the just and efficient conduct of such actions."  28 U.S.C. § 1407.  Movants bear the burden of demonstrating, however, that centralization is warranted.  See In re Hercules, 816 F.Supp.2d 1377, 1377 (J.P.M.L. 2011).  And where (as here) "only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate."  In re Enhanced Recovery, 363 F.Supp.3d 1375, 1377 (J.P.M.L. 2019).  But as demonstrated below, Movants have failed to meet their heavy burden to justify transfer and consolidation.  See disc. infra at 11-20.

### A. Common Questions Of Fact Do Not Predominate For Purposes Of Transfer

Common questions of fact must "predominate over individual questions of fact present in each action" for transfer to be justified.[7] In re Rely Tampon, 533 F.Supp. 1346, 1347 (J.P.M.L. 1982). In this instance, however, common questions of fact simply do not predominate. See disc. infra at 11-16.

### 1. The Vivid Seats Action And The Other Actions Involve Entirely Different Parties And Proposed Classes

Transfer is ordinarily not warranted where there is not sufficient overlap between the parties. See In re Credit Union, 158 F.Supp.3d 1363, 1364 (J.P.M.L. 2016). Accordingly, the Panel has denied motions to transfer where (as here) there is "variance in named defendants." In re Cordarone, 190 F.Supp.3d 1346, 1347 (J.P.M.L. 2016); see also, e.g., In re CleanNet, 38 F.Supp.3d 1382, 1383 (J.P.M.L. 2014) (denying transfer where "each action involves different Area Operator defendants"). The Panel has also denied motions to transfer where (as here) the actions "involve distinctly separate and non-overlapping putative classes."[8] In re Samsung, 322 F.Supp.3d 1380, 1381 (J.P.M.L. 2018); see also, e.g., In re NebuAd, 716 F.Supp.2d 1370, 1371 (J.P.M.L. 2010). And the Panel has denied transfer where (as here) the plaintiffs did not purchase the same product. See, e.g., In re Credit Card Payment, 753 F.Supp.2d 1375, 1375 (J.P.M.L. 2010) (denying transfer, because "the actions involve allegations against different credit card issuers regarding different products").

---

[7] The requirement of 28 U.S.C. § 1407 for "common questions of fact" is, of course, considerably different from the criteria set forth in Rule 23 for class certification. See, e.g., Multidistrict Litig. Manual § 5:11 ("The Panel has recognized that the questions of class action certification and § 1407 transfer are sufficiently unrelated[.]").

[8] Because the proposed classes between the Vivid Seats Action and the other actions do not overlap at all, the case law that Movants cite is inapposite. See Mem. (Dkt. 3-1) at 2 (citing In re Comp., 206 F.Supp.2d 1374, 1375 (J.P.M.L. 2002) (discussing "three overlapping class actions involving many of the same defendants"), and In re Propulsid, 2000 U.S. Dist. LEXIS 11651, *3 (J.P.M.L. 2000) (class actions of plaintiffs all injured by the same product)).

Indeed, here, there is <u>no</u> overlap of parties at all.  <u>See</u> disc. <u>supra</u> at 3, 5-10.  The Vivid

Seats Action only implicates Vivid Seats and Vivid Seats customers, while the other five actions

do not relate to Vivid Seats, its customers or its ticket sales at all.  <u>See</u> disc. <u>supra</u> at 3, 5-10.  The

Plaintiffs across the actions did not even purchase tickets to the same third-party events, and they

allege individualized experiences as a result of event cancellations.[9]  <u>See</u>, <u>e.g.</u>, <u>Reynolds</u> Compl.

¶ 54.  There are no common questions between the parties or proposed classes to justify transfer.

<u>See</u> <u>In re Credit Union</u>, 158 F.Supp.3d at 1364 (denying transfer, because "[t]here is no overlap

among the plaintiffs, the defendants, or the putative classes").[10]

### 2. The Vivid Seats Action And The Other Actions Involve Entirely <u>Different</u> Alleged Guarantees, Refund Policies And Representations

Where actions place at issue different contracts or warranties, centralization is not

appropriate.  <u>See</u>, <u>e.g.</u>, <u>In re Ocala Funding</u>, 867 F.Supp.2d 1332, 1332 (J.P.M.L. 2012) (denying

transfer, because there were "[i]ndividualized issues concerning each party's rights and duties

under separate sets of contracts, and with different contracting parties"); <u>In re Pharmacy</u>, 206

F.Supp.2d 1362, 1363 (J.P.M.L. 2002) (holding "unique questions of fact" predominated over

common questions of fact, because "[e]ach plaintiff is a member of a different pharmacy benefit

plan and has sued a pharmacy benefit manager (PBM) which services each plan under different

contracts").  In this instance, however, the actions involve <u>entirely</u> different alleged agreements

---

[9] Plaintiff Sousa acknowledges the Martin–Iglesias concert has not been canceled, raising unique factual questions regarding future cancellations and speculative injury.  <u>See</u> <u>Nellis</u> Compl. ¶ 88.

[10] Movants unconvincingly cite to <u>In re Proton-Pump II</u>, 261 F.Supp.3d 1351 (J.P.M.L. 2017), to argue for transfer of actions that include "multiple defendants and multiple products."  Mem. (Dkt. 3-1) at 7-8.  But those actions all involved common questions related to kidney injury.  <u>See</u> <u>In re Proton-Pump II</u>, 261 F.Supp.3d at 1353.  The Panel also originally denied a transfer motion in that instance, finding that (like here) the "named defendants var[ied] from action to action," each defendant's product had its own "marketing history," a "significant amount" of discovery was "defendant-specific" and the presence of competitors "would complicate case management due to the need to protect trade secret and confidential information."  <u>In re Proton-Pump</u>, 273 F.Supp.3d 1360, 1361-62 (J.P.M.L. 2017).  Only after the number of actions ballooned to 161 cases did the Panel decide that transfer was appropriate.  <u>See</u> <u>In re Proton-Pump II</u>, 261 F.Supp.3d at 1353-54.

(i.e., the Vivid Seats 100% Buyer Guarantee, the SeatGeek Buyer Guarantee or the StubHub FanProtect Guarantee).  See disc. supra at 3-4, 6-9.

Each Defendant is also alleged to have responded to the COVID-19 pandemic in an individualized way.  See Nellis Compl. ¶¶ 52-68 (alleging Vivid Seats offered customers the choice of a credit or a refund); Trader Am. Compl. ¶ 50 (alleging SeatGeek provided a credit or refund "in SeatGeek's sole discretion") (emphasis omitted); McMillan Compl. ¶ 23 (alleging StubHub will provide refunds in jurisdictions where it is "required by law"); see also Alcaraz Compl. ¶ 5; Kopfmann Compl. ¶ 30; Reynolds Compl. ¶ 23.  Thus, questions regarding the existence and terms of a contract between Vivid Seats and its customers and how Vivid Seats responded to the pandemic are unique to the Vivid Seats Action and are not at issue in the other cases.  See, e.g., In re Ocala Funding, 867 F.Supp.2d at 1332 ("each party's rights and duties" under contract are "[i]ndividualized issues").  Similarly, questions regarding the formation, scope, terms and breach of any contracts, guarantees or warranties between SeatGeek or StubHub and its respective customers are plainly not at issue in the Vivid Seats Action.  See id.

The Panel has also repeatedly found that actions raising questions related to different marketing, advertising and other representations do not present common questions of fact that justify transfer.  See, e.g., In re CP4 Fuel Pump, 412 F.Supp.3d 1365, 1367 (J.P.M.L. 2019) ("Individualized issues include each automaker's . . . marketing and communications with consumers."); In re Nat'l Credit Union, 996 F.Supp.2d 1374, 1376 (J.P.M.L. 2014) (denying transfer of actions involving "different representations"); In re Facebook, 816 F.Supp.2d 1380, 1380-81 (J.P.M.L. 2011) (denying transfer, because the actions focused on "different aspects of Facebook's alleged advertising").  The actions here, however, depend heavily on what each Defendant individually advertised and/or promised to its customers -- both before the pandemic

and after it began.  See Alcaraz Compl. ¶¶ 3-5; Kopfmann Compl. ¶¶ 19-31; McMillan Compl.

¶¶ 15-28; Nellis Compl. ¶¶ 36-68; Reynolds Compl. ¶¶ 15-28; Trader Am. Compl. ¶¶ 35-55.

Indeed, the actions variously assert fraud, misrepresentation and consumer protection

claims that raise fact-specific questions regarding what representations were made and whether

they were deceptive.  See Alcaraz Compl. ¶¶ 29-58, 65-77; Kopfmann Compl. ¶¶ 65-85; McMillan

Compl. ¶¶ 80-113; Nellis Compl. ¶¶ 157-180, 237-260; Reynolds Compl. ¶¶ 81-114; Trader Am.

Compl. ¶¶ 108-130; see also, e.g., Thompson v. Am. Airlines, 128 F.Supp.3d 1047, 1050 (N.D.

Ill. 2015) (fraudulent misrepresentation claim requires a false statement made knowingly).  Each

Defendant made its own representations at different points in time, conducted its own advertising

campaign and communicated with its customers about its own refund policy, and thus,

individualized questions of fact related to each Defendant's advertising campaigns predominate.[11]

See In re Credit Card Payment, 753 F.Supp.2d at 1375 (denying transfer where "several different

products . . . were marketed in different ways").

### 3. The Vivid Seats Action And The Other Actions Raise Action-Specific Questions Regarding Knowledge And Intent

Where actions raise unique questions regarding each defendant's knowledge and intent,

transfer and consolidation are not appropriate.  See, e.g., In re Skinnygirl, 829 F.Supp.2d 1380,

1381 (J.P.M.L. 2011) (issues of state of mind "would not involve common discovery").  The Vivid

Seats Action raises questions regarding what Vivid Seats knew regarding its alleged promises and

whether it intended its customers to rely on those promises.  See disc. supra at 3-4.  Questions of

Vivid Seats' knowledge and intent, however, are only at issue in the Vivid Seats Actions, which

---

[11] For example, StubHub offered customers either a 120% coupon or a refund but later offered the
choice of a refund only to customers in certain jurisdictions.  See McMillan Compl. ¶¶ 22-23.
SeatGeek, in contrast, offered a 100% coupon or a refund but claimed sole discretion in the
decision.  See Trader Am. Compl. ¶¶ 50.  Vivid Seats, however, has always offered a refund.  See
Nellis Compl. ¶ 62.  Indeed, at least two of the Plaintiffs in the Vivid Seats Action have received
a full refund.  See disc. supra at 5.

does not raise issues related to the knowledge and intent of SeatGeek or StubHub.[12]  See disc.
supra at 3-4.  Therefore, common questions of fact sufficient to justify transfer do not exist.[13]  See
In re CP4 Fuel Pump, 412 F.Supp.3d at 1366 (denying transfer where there were individual issues
of each defendant's "knowledge").

### 4.   Movants' Assertion Of A Common Business Model Is Insufficient To Justify Transfer

Movants assert that Defendants follow a similar business model.  See Mem. (Dkt. 3-1) at
6-8.  But even if true, the fact that competitors may follow a similar business model would not
create common factual issues for purposes of transfer.  See, e.g., In re Fla., P.R. & V.I., 325
F.Supp.3d 1367, 1368 (J.P.M.L. 2018) (fact that different insurers breached policies in similar
ways creates "only a superficial factual commonality"); In re Mortg. Lender, 895 F.Supp.2d 1352,
1353 (J.P.M.L. 2012) (denying transfer, because actions still involved different defendants and
contracts); In re Louisiana Coastal Zone, 317 F.Supp.3d 1346, 1346-47 (J.P.M.L. 2018) (denying
transfer, because although "certain industry practices may be common across the actions," each
action was against a "different cast of defendants" and "most pretrial proceedings, particularly
discovery, will be largely individualized"); see also In re CleanNet, 38 F.Supp.3d at 1383.

Nor is it enough to assert that each Defendant failed to provide refunds as a result of
COVID-19.  See id.; In re Am. Bd. of Med., 382 F.Supp.3d 1353, 1353-54 (J.P.M.L. 2019)
(allegations that defendants engaged in similar violations of law not sufficient to warrant transfer).
Indeed, while Movants cite to two airline cases from the early 1970s in arguing that refund cases

---

[12] For this reason, Movants are incorrect in asserting that questions related to what each Defendant
"determine[d]," "had actual or constructive knowledge of," "knew" and "could have reasonably
believed" are somehow common across the actions.  See Mem. (Dkt. 3-1) at 6-7.

[13] Movants argue that "the presence of individual issues does not foreclose MDL treatment."  Mem.
(Dkt. 3-1) at 7.  But they cite cases that involved a party common to all actions.  See In re Zimmer,
802 F.Supp.2d 1374, 1376-77 (J.P.M.L. 2011) (Zimmer and its products); In re Katz, 481
F.Supp.2d 1353, 1355 (J.P.M.L. 2007) (Katz and its patents); In re Xarelto, 65 F.Supp.3d 1402,
1405 (J.P.M.L. 2014) (Xarelto); In re E.I. du Pont, 939 F.Supp.2d 1374, 1374 (J.P.M.L. 2013) (E.I.
du Pont); In re Satyam, 712 F.Supp.2d 1381, 1382 (J.P.M.L. 2010) (Satyam Computer Services).

are appropriate for transfer, those cases raised overarching federal questions related to the Federal Aviation Act and the Civil Aeronautics Board as well as overlapping classes, none of which are present here.  See In re Air Fare, 322 F.Supp. 1013, 1014-15 (J.P.M.L. 1971); In re Pub. Air Travel, 360 F.Supp. 1397, 1399 (J.P.M.L. 1973); see also disc. infra at 18-19.[14]  In contrast, the actions here arise under different state laws, do not raise common federal questions and do not propose overlapping classes.   See Alcaraz Compl. ¶¶ 29-90; Kopfmann Compl. ¶¶ 52-89; McMillan Compl. ¶¶ 65-113; Nellis Compl. ¶¶ 103-284; Reynolds Compl. ¶¶ 66-114; Trader Am. Compl. ¶¶ 71-138.

### B.  Centralization Would Not Serve The Convenience Of The Parties Or The Witnesses

Movants have also failed to meet their burden of establishing that centralization would "serve the convenience of the parties and witnesses."  In re Am. Bd. of Med., 382 F.Supp.3d at 1353-54.  Transfer is not warranted where "the conduct of different [] defendants appears to be at the heart of th[e] litigation," such that "discovery of this conduct will tend to be individualized." In re Provident, 715 F.Supp.2d 1356, 1357 (J.P.M.L. 2010).  In this instance, however, discovery into at least the following questions would be defendant-specific:  (1) what guarantee, if any, was offered; (2) how the guarantee was advertised; (3) how customers used the website to purchase tickets; (4) what the terms of each purchase were; (5) whether each Defendant refunded ticket purchases to canceled events; (6) how each Defendant communicated with its customers regarding refunds; (7) what each Defendant knew; and (8) what each Defendant intended.  See disc. supra at

---

[14] Movants' other cases are also distinguishable.  In re Nat'l Prescription, 290 F.Supp.3d 1375, 1377-78 (J.P.M.L. 2017) (alleging conspiracy and raising questions under federal statutes, including RICO and Controlled Substances Act); In re Humana, 2000 WL 1925080, *2 (J.P.M.L. 2000) (alleged conspiracy among defendants).  Movants also cite In re Checking Account, 626 F.Supp.2d 1333 (J.P.M.L. 2009), but the Panel has distinguished that decision and denied transfer where (as here) the actions "involve not only different defendants but also different products, marketing, [] agreements, and customer claim administration."  In re Credit Card Payment, 753 F.Supp.2d at 1376; see also In re Mortg. Lender, 895 F.Supp.2d at 1353.

3-10; <u>see</u> <u>also</u> <u>In re Provident</u>, 715 F.Supp.2d at 1357 (denying transfer because of "individualized" discovery).

Document discovery would clearly be specific to each Defendant.  <u>See</u>, <u>e.g.</u>, <u>In re Watson</u>, 883 F.Supp.2d 1350, 1351 (J.P.M.L. 2012) (denying transfer of actions that involved separate "company documents").  Each Defendant also has its own employees, and thus, there would also be no overlap in witnesses.  <u>See</u> <u>In re Hotel Indus.</u>, 2020 WL 581882, *2 (J.P.M.L. 2020) (denying transfer, because actions involved "different witnesses"); <u>In re Fla., P.R. & V.I.</u>, 325 F.Supp.3d at 1368 (same).  Indeed, even the potential witnesses identified in the Complaints are unique to each Defendant.  <u>See</u> <u>Alcaraz</u> Compl. ¶¶ 14-15; <u>Kopfmann</u> Compl. ¶¶ 11-12; <u>McMillan</u> Compl. ¶¶ 12-14; <u>Nellis</u> Compl. ¶¶ 11-15; <u>Reynolds</u> Compl. ¶¶ 12-14; <u>Trader</u> Am. Compl. ¶¶ 10-12.

Nor would the discovery of Plaintiffs' claims overlap, since each Plaintiff allegedly purchased tickets sold by different parties to different events canceled by various third-parties.  <u>See</u> <u>Alcaraz</u> Compl. ¶ 14; <u>Kopfmann</u> Compl. ¶ 33; <u>McMillan</u> Compl. ¶ 51; <u>Nellis</u> Compl. ¶¶ 69, 75, 83-86; <u>Reynolds</u> Compl. ¶ 50; <u>Trader</u> Am. Compl. ¶¶ 56, 58; <u>see</u> <u>also</u> <u>In re Fla., P.R. & V.I.</u>, 325 F.Supp.3d at 1368.  With no overlapping discovery across the actions, however, it would make no sense to require an Illinois company, a California company and a New York company to litigate in one forum.  <u>See</u> <u>In re Hotel Indus.</u>, 2020 WL 581882, *2 (denying transfer across the country given individualized discovery).

Moreover, Vivid Seats, SeatGeek and StubHub are direct competitors, and the Panel is "typically hesitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products."  <u>In re Yellow Brass</u>, 844 F.Supp.2d 1377, 1378 (J.P.M.L. 2012) (denying transfer); <u>see</u> <u>also</u> <u>In re CP4 Fuel Pump</u>, 412 F.Supp.3d at 1367 ("[C]entralizing competing defendants in the same MDL likely would complicate case management due to the need to protect trade secret and confidential information.").

**C.  Centralization Would Not Promote The Just And Efficient Conduct Of The Litigation**

Movants have also failed to meet their burden of establishing that centralization would "further the just and efficient conduct of th[e] litigation."  In re Am. Bd. of Med., 382 F.Supp.3d at 1353-54.  The causes of action against each Defendant are state law claims, and the customers of each Defendant agreed that the terms of use for their ticket purchases would be governed by the laws of different states.  See Vivid Seats Terms of Use, Ex. A, at 11 (Illinois law); SeatGeek User Agt., https://seatgeek.com/terms, § 15.7 (New York law); StubHub User Agt., https://stubhub.com/legal/?section=fp, § 21 (California law).  Moreover, proof of the elements of each claim and defenses thereto will require individualized inquiries regarding contract formation, breach, knowledge, intent, materiality, reliance, causation and damages.[15]  See disc. supra at 12-15.  As such, centralization is not needed to avoid conflicting rulings.  See In re AriZona, 609 F.Supp.2d 1369, 1369 (J.P.M.L. 2009) (denying transfer where "plaintiffs' claims are brought under the laws of their respective states"); In re Skinnygirl, 829 F.Supp.2d at 1381 (substantially same); In re Uber, 158 F.Supp.3d 1372, 1373 (J.P.M.L. 2016) (determinations based on "state-specific legal and factual inquiries" are "not suitable for centralized pretrial proceedings"); In re Ambulatory Pain, 709 F.Supp.2d 1375, 1377 (J.P.M.L. 2010) (individual legal and factual issues are "likely to overwhelm any efficiencies that might be gained by centralization").[16]

Further, where (as here) the Vivid Seats Action and the other actions "involve distinctly separate and non-overlapping putative classes[,] . . . there is no threat of conflicting class

---

[15] Movants assert that common defenses can support centralization but cite only a decision involving a uniform jurisdictional defense under a federal statute.  See Mem. (Dkt. 3-1) at 7 (citing In re Yosemite, 24 F.Supp.3d 1370 (J.P.M.L. 2014).  No common federal defense, however, has been identified here, and each Defendant will raise defenses particular to the facts and law of each case.  See disc. supra at 5-6, 8, 10.

[16] The decisions Movants cite are inapplicable:  they arose out of a single event (In re Air Crash, 623 F.Supp. 634, 635 (J.P.M.L. 1985)) or involved the conduct of a common defendant (In re Discover Card, 764 F.Supp.2d 1341, 1342 (J.P.M.L. 2011) (Discover); In re Wireless, 249 F.Supp.2d 1379, 1379 (J.P.M.L. 2003) (AT&T); In re Ins. Brokerage, 360 F.Supp.2d 1371, 1372 (J.P.M.L. 2005) ("common defendants")).

certification rulings." In re Goodman, 987 F.Supp.2d 1380, 1380 (J.P.M.L. 2013); see also In re Am. Bd. of Med., 382 F.Supp.3d at 1354.  Nor is there any risk of conflicting pretrial discovery rulings, given the individualized nature of the discovery at issue.  See In re Credit Union, 158 F.Supp.3d at 1364.

Indeed, transfer and consolidation would be unjust and unfair.  Vivid Seats is a Defendant in only one action, and requiring Vivid Seats to participate in multidistrict litigation with two of its competitors would overly complicate and slow down the litigation.  See, e.g., In re Reglan, 622 F.Supp.2d 1380, 1381 (J.P.M.L. 2009) (denying transfer where some entities "are named in only one or two actions").  Vivid Seats intends to file an early motion to compel arbitration and to dismiss or stay the case, and Vivid Seats has a strong interest in having that motion decided as early as possible.[17]  See Joint Status Rpt. (Nellis Dkt. 10) at 2-3, 5.  Transfer is inappropriate, however, where individual arbitration clauses are at issue.  See In re Narconon, 84 F.Supp.3d 1367, 1368 (J.P.M.L. 2015); In re Trilegiant, 828 F.Supp.2d 1362, 1363 (J.P.M.L. 2011).

### D.  Alternatives To A Multidistrict Litigation

"[C]entralization under Section 1407 should be the last solution after considered review of all other options."  In re Best Buy, 804 F.Supp.2d 1376, 1378 (J.P.M.L. 2011).  The Panel, however, routinely denies motions to transfer where alternatives to transfer exist, especially where (as here) only a handful of cases are in play and any necessary coordination can be achieved informally.  See In re Wells Fargo, 2020 WL 1503252, *2 (J.P.M.L. 2020); In re Uber, 158 F.Supp.3d at 1373; In re CP4 Fuel Pump, 412 F.Supp.3d at 1367.  Because there is no overlap between the Vivid Seats Action and the other actions, no coordination of discovery is required. See disc. supra 11-16.  Indeed, only the four StubHub Actions involve a common Defendant and overlapping classes, and given the small number of those actions, any coordination among the

---

[17] A schedule for briefing of the motion to compel arbitration has already been set by the Court. See Minute Order (Nellis Dkt. 15).

StubHub Actions can be handled informally or through transfer pursuant to 28 U.S.C. § 1404.  See In re Best Buy, 804 F.Supp.2d at 1378.

If the Panel nonetheless determines that multidistrict litigation is warranted for the StubHub Actions, Vivid Seats respectfully requests that the Vivid Seats Action not be included within the scope of any transfer order given the lack of overlap and the inconvenience it would cause Vivid Seats.  See In re Tropicana, 867 F.Supp.2d 1341, 1341-42 (J.P.M.L. 2012) (transferring actions involving Tropicana-brand orange juice but denying transfer of other actions involving other brands); In re AT&T, 710 F.Supp.2d 1378, 1380 (J.P.M.L. 2010) (excluding one action from transfer because it alleged claims unrelated to the claims in the other actions).[18]

## IV.   CONCLUSION

For the reasons stated herein, Vivid Seats respectfully requests that the Panel deny Movants' motion for transfer and consolidation and grant such further relief as it deems just.

Dated:  June 22, 2020

Respectfully submitted,

*/s/ Mark S. Mester*
Mark S. Mester, Counsel for Vivid Seats LLC

Mark S. Mester
   mark.mester@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

---

[18] If the Panel does order transfer of all actions, centralization before Judge Robert M. Dow, Jr. or another judge in the United States District Court for the Northern District of Illinois is most appropriate, because the Vivid Seats Action, assigned to Judge Dow, is currently pending in the Northern District of Illinois and Vivid Seats is based in Chicago, Illinois.  See Minute Order (Nellis Dkt. 5); Nellis Compl. ¶ 15.